U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 JUL 16 PM 4:42

CLERK

BY____pjl____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

LINDA WEST,

    Plaintiff,

v.

CAROLINA CASUALTY INSURANCE
COMPANY,

    Defendant.

Case No. 5:17-cv-44

## DECISION ON MOTIONS FOR SUMMARY JUDGMENT
**(Docs. 17, 20)**

Both parties move for summary judgment in this coverage case filed by Plaintiff Linda West against Defendant Carolina Casualty Insurance Company ("Carolina") pursuant to Vermont's direct-action statute, 8 V.S.A. § 4203(3). The facts are undisputed.

### FACTS

Prior to September 2015, Seldon Technologies, Inc. ("Seldon") was a manufacturer of water filters located in Windsor, Vermont. Seldon obtained liability insurance, including employment practices coverage, from Carolina in January 2013. The policy was a claims-made and reported policy. The initial policy period ran from January 28, 2013 to January 28, 2014. (Doc. 20-7.)

In March 2013, Seldon terminated the employment of Linda West, whom it had employed as an accountant. In May 2013, West filed suit against Seldon in state court on grounds of age discrimination. On June 13, 2013, Seldon's Vice President of Finance, George Hillman, reported the lawsuit to Carolina. (Doc. 20-11.)

Between June 18 and July 8, 2013, Mr. Hillman and Carolina's representative Jacqueline Noster discussed legal representation for Seldon in the pending lawsuit. Mr. Hillman sought continued representation by Seldon's attorneys at Nixon Peabody LLP. Ms. Noster stated that

1

Carolina controlled the choice of defense counsel and wished to have attorney Gary Franklin of Primmer Piper Eggleston & Cramer PC handle the defense. The impasse was broken at the end of July 2013 when Mr. Hillman executed a release discharging Carolina from any obligation to defend or indemnify Seldon in connection with West's lawsuit. (Doc. 20-10.)

While West's lawsuit against Seldon was pending, Seldon experienced serious financial difficulties. On September 26, 2015, Seldon's board authorized liquidation of its assets. (Doc. 20-3 at ¶ 8.)

On December 28, 2015, Seldon's counsel from Nixon Peabody moved to withdraw in the state court case, stating that Seldon was no longer an operating entity, had auctioned its assets, and had no remaining funds. *See West v. Seldon Techs., Inc.*, No. 325-5-13 Wrcv (Vt. Super. Dec. 28, 2015) (motion for leave to withdraw as counsel). That motion was granted on February 5, 2016. *See West v. Seldon Techs., Inc.*, No. 325-5-13 Wrcv (Vt. Super. Feb. 5, 2016) (entry regarding motion for leave to withdraw as counsel). On May 19, 2016, the state court granted West's motion for default judgment as to liability and ordered further proceedings to determine the amount of damages. *See West v. Seldon Techs., Inc.*, 325-5-13 Wrcv (Vt. Super. May 19, 2016) (entry regarding motion for default judgment). On June 30, 2016, a jury returned a damages verdict in the amount of $400,000, and the state court issued a judgment in favor of West against Seldon in the amount of $400,000 plus interest and costs. (Doc. 17-15 at 2–3.)

Plaintiff filed this action on March 20, 2017, seeking payment of the judgment with interest under Vermont's direct-action statute.

## ANALYSIS

In this diversity case, the court applies the law of Vermont, which governs both the construction of a policy issued to a Vermont corporation and the execution of a release cancelling coverage by that company. The questions presented by the case have not been resolved by Vermont legislation or the decisions of the Vermont Supreme Court. "To the extent that state law is uncertain or ambiguous, [the court] must 'carefully . . . predict' how the state's highest court would resolve the uncertainty or ambiguity." *Maska U.S., Inc. v. Kansa General Ins. Co.*, 198 F.3d 74, 78 (2d Cir. 1999) (citation omitted). Here, the parties have not cited and the court has not found any squarely controlling Vermont precedent.

American courts have long recognized a restriction on the right of an insured to cancel coverage after a loss has occurred. Both case law and the leading insurance treatises identify circumstances in which the release of rights under a liability policy violate public policy because it defeats the settled expectation of the injured party that insurance will respond to the claim. This principle can be traced back to fire insurance cases of the nineteenth century and forward to third-party cases in the modern era.

The recognition of restrictions on the right of an insured to cancel coverage after a loss has its origins in the recognition that in the first-party setting, multiple parties may have interests in the same insurance proceeds. *See Home Ins. Co. v. Baltimore Warehouse Co.*, 93 U.S. 527 (1876) (fire insurance obtained by a warehouse owner protected both the interest of the named insured and the interest of the owners of the goods). Although the owner of the goods was not a named insured or otherwise a party to the insurance contract, courts devised legal theories to protect the owner from a cancellation after the loss.

Courts held that when warehouse operators insured goods stored on their premises, they were agents or trustees acting on behalf of the owners of those goods. As principals in this relationship, the owners of goods had the right to ratify or adopt insurance contracts *after* a loss. *Edwards v. Cleveland Mill & Power Co.*, 193 N.C. 780, 138 S.E. 131 (1927). From these cases, it was a short step to recognizing that cancellation of a first-party policy following a loss was ineffective against the owner of the insured personal property.

In *Ins. Co. of North America v. United States*, 159 F.2d 699 (4th Cir. 1947), the federal Commodity Credit Corporation was in the process of obtaining its own coverage for cotton it stored in private warehouses when a fire occurred. It had not completed the process of obtaining insurance before the loss. Following the fire, the warehouse operator continued to implement the original plan to cancel coverage. The court held that the cancellation of an insurance policy does not affect rights that have already accrued under the policy in favor of the insured or of a third party such as the owner of the goods. *Id.* at 701.

By 1934, the principle that the rights of injured parties to insurance coverage cannot be defeated by cancellation of a policy appeared in the context of third-party liability coverage. In *Spann v. Commercial Standard Ins. Co. of Dallas, Tex.*, 82 F.2d 593 (8th Cir. 1936), the plaintiff was injured in a truck accident a few days after the owner obtained coverage. The insurance

3

sales agent sought to cancel the policy. The ensuing dispute over the authority of an agent to cancel coverage is of little interest here, but one part of the Eighth Circuit's ruling is relevant. The court rejected the argument that the truck owner had ratified the unauthorized cancellation of his own policy. "The rights of the injured party arise . . . immediately upon the happening of the accident. This right, arising from contract, cannot be destroyed by an attempted subsequent cancellation, release, or compromise by the insured and insurer. A contrary rule allowing the insured and insurer to destroy the claim of the injured would render the right of little value." *Id.* at 599 (citations omitted).

In *Capuano v. Kemper Ins. Co.*, 433 A.2d 949 (R.I. 1981), the Rhode Island Supreme Court rejected the insurers' efforts to cancel a policy following a fatal auto accident. That case turned principally on the requirement of written notice to the insured, but in considering whether the named insured had acquiesced in the cancellation of the policy, the court cited cases such as *Ins Co. of North America* and *Spann* for the broader proposition that "[i]t is well settled that an insurance company cannot cancel a policy and an insured cannot ratify a defective cancellation after loss has occurred and liability has attached." *Id.* at 955.

In *In re Mathews*, 207 B.R. 631 (Bankr. D. Minn. 1997), the bankruptcy court set aside a settlement between the insured and the insurance company which released all claims for bad faith settlement practices in exchange for a cash payment to the insured. The doctrinal basis for the court's action was the public policy against collusion and the "statutory policy [under Minnesota law] that requires liability insurers to shoulder and bear all of their contractual duties to insureds." *Id.* at 645. The court also relied on policy concerns directly relevant only in the bankruptcy context. The decision holds that in the case of a collusive cancellation, the courts recognize that liability insurance protects injured third parties fully as much as the named insured. "The judicial bar on enforcement of collusive agreements [between an insured and the insurer to discharge coverage] . . . extends to those . . . which have the effect of depriving non-agreeing parties of their participation in a legal process—and a compromise of professional allegiance or self-interest on the part of the agreeing parties or their counsel is not a prerequisite to the characterization." *Id.* at 643 (citation and internal quotation marks omitted).

The cases are not all in agreement. In *Cowley v. Texas Snubbing Control, Inc.*, 812 F. Supp. 1437 (S.D. Miss. 1992), the district court denied the claims of a third party damaged by

4

a blow out at an oil well following a settlement between the insurer and the at fault party. The court distinguished cases such as *Spann* and *Capuano* on the ground that a tort victim who has reduced his claim to final judgment is considered a third-party beneficiary of the liability policy. Since the claimant in *Texas Snubbing* had not obtained a final judgment before bringing suit, he was considered a stranger to the insurance contract.

The leading insurance treatises recognize the right of third parties to oppose the cancellation of coverage for their claims. *See* Couch on Insurance § 31.49 ("Where the contract of insurance provides for liability to third person, the insurer and the insured cannot terminate such a contract by their voluntary action to the prejudice of a claimant's rights which have already vested."); Appleman on Insurance Law & Practice Archive § 5020 ("However, it is the general rule that an injured person's rights cannot be defeated by a cancellation or settlement after an accident has occurred."); *but see* Williston on Contracts § 49:129 ("It is generally agreed that a policy may be canceled at any time before a loss occurs, by an agreement between parties. Authorities are divided when the purported cancellation takes place after a loss has occurred.")

The doctrinal basis for limiting the right of parties to an insurance contract to cancel is the law of unconscionability.[1] As in other cases of unconscionability, case law places limits on freedom of contract when necessary to implement public policy. Section 178 of the Restatement (Second) of Contracts recognizes the unenforceability of contracts when "the interest [of the parties to a contract] is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." Section 178 identifies four factors relevant to the weighing process:

- The strength of that policy as manifested by legislation or judicial decisions;
- The likelihood that a refusal to enforce the term will further that policy;

---

[1] Courts have been largely unanimous in rejecting third-party beneficiary theories as a basis for restricting cancellation since the claimant is often unknown and unidentified as a beneficiary when the policy issues. *See* Michael Quinn, *"The" "Insurance Buyback"*, 28 No. 18 Ins. Litig. Rep. 661 (2018) ("Third-party beneficiary doctrine would be a simple way to make liability insurance policies both unrescindable on the basis of mutual desire and uncancellable. If liability insurance policies are made for the benefit of an unspecified class, namely, all those who might be injured, then—as a matter of logic—they are made for the benefit of those who actually are injured, at least in some sense. Courts however have uniformly rejected this move."); *but see Finkelberg v. Continental Casualty Co.*, 126 Wash. 543, 219 P. 12 (Wash. 1923) (identity of claimant became known at time of accident and she then became a third-party beneficiary).

5

- The seriousness of any misconduct involved and the extent to which it was deliberate;
- The directness of the connection between that misconduct and the term.

The first and second factors apply in this case. There is no evidence of misconduct or illegality to support the third and fourth factors. The case law demonstrates that the policy disfavoring cancellation of policies has long been recognized by the courts. These cases are not great in number because few insureds seek to cancel their coverage *after* a loss or the commencement of litigation.

In reviewing the case law, the court recognizes the near universal rule that liability insurance may not be canceled or rescinded in most cases in which injury is alleged and a lawsuit has been commenced. There are exceptions to the general rule such as policies issued to replace existing coverage, non-payment of premium, and errors or fraud in policy applications. But as a general rule, a cancellation of coverage which greatly harms the position of the injured tort litigant violates public policy and will not be enforced by the courts.

The court will follow the majority rule in recognizing the public policy against cancellation in cases in which litigation has commenced following an insured injury. The policy arises from a consideration of the different interests of the three parties: the insurer, the insured, and the claimant-plaintiff.

The insurer has little or no recognizable interest in the cancellation of coverage. Through the underwriting process, the insurer has been paid in full to take on the risk. A cancellation might avoid a payment in an individual case, but insurers are in the business of paying valid claims, not avoiding coverage.

The insured-defendant also has little interest in cancelling coverage. Except for the possible return of the unused premium, there is little to gain in cancelling coverage in the face of a pending lawsuit. The court cannot give weight to the insured's potential interest in colluding with its insurer to cancel coverage for merely spiteful reasons or other improper purposes.

Against these minimal interests, the court considers the very strong interest of the claimant-plaintiff in maintaining coverage for a future judgment. As this case illustrates, if coverage is cancelled, the judgment very often goes unsatisfied.

Exactly when the public policy against post-injury cancellation comes into effect is a complex and fact-specific question. At a minimum, the occurrence of a loss is required. Subject to regulatory requirements and mandatory insurance statutes, parties are free to cancel coverage before a loss. The claimant opposing cancellation is on safer ground if he or she has already commenced litigation. Even cases which do not favor restrictions on the right to cancel such as *Texas Snubbing* recognize that the insurer's liability becomes fixed upon entry of final judgment and subsequent cancellation by the insured may no longer be enforceable.

In the present case, the alleged injury occurred and suit was commenced before cancellation. These events place the case within the class of cases in which cancellation is generally not enforceable.

In considering the interests identified by Carolina, it is necessary to consider Seldon's stated preference for selecting its own counsel even though the choice required it to give up its liability protection, including the costs of defense. Insured parties may be represented by their own attorneys who appear at trial and participate at all stages of the case in conjunction with counsel selected by the insurer. Restatement (Third) of the Law Concerning Lawyers, § 134, Comment F (addressing circumstances under which insurance defense counsel may represent an insured). A party who is sincerely concerned with protecting a legal interest which is separate from the potential liability for which it obtained insurance coverage can always retain personal counsel. Likewise, a party who desires the advice of trusted counsel other than that provided by its insurer can engage such counsel in addition to, rather than instead of, the counsel provided by the insurer pursuant to coverage. It is unnecessary to waive coverage altogether in order to achieve any legitimate objective served by the involvement of personal counsel.

The weight to be accorded to Seldon's insistence upon a defense by its existing counsel as a basis for canceling coverage is further reduced by the inauspicious history of the case. Seldon discharged its chosen counsel and allowed the case to fall into default. It succeeded in surrendering its coverage and hiring attorneys whom it terminated without replacement. These are hardly "interests" which outweigh or offset to any meaningful extent the complete forfeiture of West's ability to recover compensation for the harm the jury determined she experienced.

## CONCLUSION

Plaintiff's motion for summary judgment (Doc. 17) is **GRANTED**. Defendant's cross-motion for summary judgment (Doc. 20) is **DENIED**. Plaintiff is **ORDERED** to submit a proposed judgment order within 30 days of the issuance of this order.

Dated at Rutland, in the District of Vermont, this 16 day of July, 2018.

Geoffrey W. Crawford, Chief Judge
United States District Court